**Obie BROOKS, Petitioner,**

v.

**E. P. PERINI, Superintendent Marion Correctional Institution, Respondent.**

**Civ. No. C 73–218.**

United States District Court,
N. D. Ohio, W. D.

Nov. 29, 1973.

Obie Brooks, pro se.

Leo J. Conway, Asst. Atty. Gen., Columbus, Ohio, James G. Carr, Univ. of Toledo Coll. of Law, Toledo, Ohio, for respondent.

## OPINION

DON J. YOUNG, District Judge.

This cause came to be heard on a petition for a writ of habeas corpus. The petitioner is presently incarcerated

in the Marion Correctional Institution, Marion, Ohio pursuant to a conviction under § 2901.05, Ohio Revised Code, for second degree murder. The petitioner was tried before a three-judge panel of the Court of Common Pleas of Summit County, Ohio.

The petitioner appealed his conviction in the Court of Appeals of Summit County, Ohio, which affirmed the conviction following oral arguments. The petitioner subsequently filed a notice of appeal and memorandum in support of jurisdiction in the Supreme Court of Ohio. The Supreme Court of Ohio denied petitioner's request for leave to appeal from the judgment of the Summit County Court of Appeals.

The petitioner in his petition alleges five bases to support his petition for a writ of habeas corpus, (1) denial of a fair trial and due process of law when the trial court admitted testimony of witnesses where the prosecutor had failed to provide defense counsel the prior statements of those witnesses until 3:30 P.M. the day before trial was scheduled to commence although the trial judge had ordered the disclosure of all such statements; (2) denial of a fair trial and due process because the trial judge refused to grant a continuance for defense counsel to study the statements of the prosecution witnesses presented to the petitioner the day before the trial; (3) denial of a fair trial and due process because the prosecutor withheld certain statements and evidence which would tend to exculpate the petitioner; (4) denial of a fair trial and due process when the trial court admitted testimony concerning statements made by petitioner which contravenes Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and (5) denial of due process of law by the Ohio Supreme Court when it referred oral arguments of petitioner's appeal to a master commissioner.

### I.

Initially, the respondent contends that the petitioner has failed to exhaust his state remedies because the petitioner has not utilized the provisions of § 2953.-21 et seq., Ohio Revised Code (Ohio's post-conviction relief act). The Court, however, finds that the petitioner has exhausted his available state court remedies required by 28 U.S.C. § 2254(b) and (c) as interpreted by Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The petitioner has previously presented all the federal constitutional claims in his petition to the highest state appellate court as indicated by the Brief of Petitioner submitted to the Ohio Supreme Court (Exhibit III(V) to Respondent's Answer to the Show Cause Order of this Court). As indicated by Picard v. Connors, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), a state prisoner need only have presented his constitutional claims to the highest state court to meet the exhaustion requirements of 28 U.S.C. § 2254. This Court stated in Howell v. Perini, Civil No. 73–248 (N.D.Ohio, filed September 21, 1973) that when a state prisoner has once presented his federal constitutional claims to the highest court on an appeal of right, and the state courts have had an opportunity to pass on those claims, the petitioner need not pursue the additional procedures available under § 2953.21 et seq., Ohio Revised Code, before presenting to the federal courts his constitutional claims by means of a writ of habeas corpus.

### II.

The Court passes only upon petitioner's claim regarding the alleged denial of a fair trial and due process of law when the trial court admitted a statement made by the petitioner which contravenes Miranda v. Arizona, *supra,* since the Court believes this issue requires the issuance of the writ. Accordingly, the other issues presented by the petitioner are not here considered.

The facts giving rise to this constitutional claim are sufficiently clear from the transcript of the hearing on the motion to suppress and the trial, so that no hearing is required in this Court.

The petitioner received a full and fair evidentiary hearing in the state court presenting the relevant facts. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 170 (1963).

Petitioner's claim of a violation of his *Miranda* rights comes from the introduction into evidence at his trial of a transcript of a recorded statement that the petitioner gave to the authorities concerning the events of the shooting of one Robert J. Mann. The facts supporting this claim are not in dispute. It appears from the transcript of the suppression hearing and the trial that the petitioner was taken into custody by Officers Everett Peasley and Robert Farmer of the Akron Police Department at approximately 10 or 10:30 A.M. on November 9, 1971, (Tr. Vol. I, 19, 42; Vol. II, 189, 303) who thereafter transported petitioner to the police station and placed him in an interrogation room (Tr. Vol. I, 19, 45; Vol. II, 190). The statement at issue was made after petitioner had been placed under arrest but prior to being "booked" on charges of first degree murder. (Tr. Vol. I, 25; Vol. II, 196). The petitioner was advised of his *Miranda* rights by the arresting officers prior to being interrogated concerning the shooting death of Robert J. Mann. (Tr. Vol. I, 19–20, 46, 54; Vol. II, 190–91, 304–05). There is a conflict in the testimony between the petitioner and the police officers as to whether the petitioner made an oral statement to the police officers prior to making the recorded statement concerning the same events as appears in the controverted statement. The petitioner stated that he made no oral statement to the officers prior to his recorded statement at issue. (Tr. Vol. I, 47; Vol. II, 304). Officer Peasley, on the other hand, testified at the trial that the defendant responded prior to the recorded interview to questions about the events of the shooting. (Tr. Vol. II, 192). This dispute is of little consequence as petitioner's claim goes to the introduction of the recorded statement. In any event, the arresting officers sub-sequent to some preliminary conversations with the petitioner summoned the Assistant County Prosecutor Charles Lowrey to conduct the recorded interrogation in question. (Tr. Vol. I, 36–37; Vol. II, 196). Prosecutor Lowrey proceeded to conduct the interview at which the two arresting officers were also present. (Tr. Vol. I, 30, 47, 55–56; Vol. II, 192–94). The County Prosecutor, before beginning his interrogation, advised the petitioner of his constitutional rights as established in *Miranda*. (Tr. Vol. I, 31, 57, 59–60).

At this critical point, the parties to the interview have confused recollections about the events that transpired during the interrogation. Unfortunately, the transcript of the interrogation was not presented to this Court, so the Court has had to reconstruct the pertinent parts from the transcripts presented. The petitioner stated at the hearing and the trial that the prosecutor asked him to make a statement, and that he started on it and then he stopped because he wanted a lawyer and communicated this desire to the prosecutor. Petitioner related that the prosecutor stated he would call the judge and try to arrange to get the petitioner a lawyer, and the prosecutor then immediately left the room for fifteen minutes. Upon returning, according to the petitioner, the prosecutor told the petitioner that he could not get in contact with the judge. The petitioner then testified that the prosecutor again began to question him and that he answered some of the prosecutor's questions but after about five or ten minutes the petitioner again requested the presence of a lawyer. The prosecutor, according to Brooks, once again left the room and upon his return told the petitioner that he had reached the judge but that he could not contact a lawyer. Petitioner then testified that after being informed by the prosecutor that he could not contact a lawyer, the prosecutor again read him the *Miranda* warnings. (Tr. Vol. I, 47–52; Vol. II, 305–06). At this point the transcript of the petitioner's exami-

nation at the suppression hearing is as follows:

Q All right. I am interested in what happened when the prosecutor came back?

A He told me that he had reached the Judge but that he couldn't reach the lawyer.

Q And what did you say to that?

A I don't remember the exact words.

Q Did they start taking your statement at that time?

A Yes, after he read me my rights again.

Q He read them to you?

A Yes.

Q And what did you answer when you got down to the part where, "If you cannot afford to hire a lawyer, one will be appointed for you before any questioning and the State will pay them." And he asked you if you understood that and your answer was, "Yes." ?

A Yes.

Q All right. And another question was, "Having all of these rights in mind, do you wish to talk without an attorney?" And you said, "Yes, I will talk to you." You also said, "I would like to have one, but since there is none, it's all right." Now, why did you say that?

A This is prior to that statement I made; that is when he said that he couldn't get a lawyer. And this was the purpose of the statement.

Q What do you mean, the purpose of the statement?

A I said it because they were trying to get me a lawyer. This is what I was told. And so, since they couldn't get a lawyer, this is the purpose of the statement. This is why I made the statement.

Q But, you did want an attorney at that point?

A I most certainly did. (Tr. Vol. I, 51–52).

Prosecutor Lowrey indicated the following at the suppression hearing:

Q Do you recall a conversation to Mr. Brooks to the effect that he was entitled to an attorney to be present with him prior to any interrogation actually taking place?

A Well, of course, that admonishment is part of the Miranda Warning and either—I would never rely—even though I would be assured that policemen had conducted or, you know, administered the warning, I would never rely on it. I always administer or make a Miranda warning and the Miranda questions, I always do that myself.

Q Well, was there—do you recall any conversation taking place outside the transcript of the recording that we have before us was—the basis of this?

A Yes, I do.

Q All right. The outside, the ancillary conversation, did that consist of any statements to the effect that a Judge would be called to secure an appointment of counsel for this defendant?

A Well, I know that that is the way counsel is appointed by, you know, by calling to the Judge who is presiding on the Common Pleas Court at that time and, and I don't recall having such a conversation with Brooks, but I know it to my knowledge, so it may have happened, because my memory is not so total nor my recall so complete that I can tell you now, under oath, that I didn't say it. I know it's truth and I may have said it.

Q Did you, in fact, make a call to any of the Common Pleas Judges of Summit County for the appointment of counsel for this defendant, Obie Brooks?

A Mr. Lowrey, I have been thinking about this to myself ever since this morning, you know,

when I became, during the interrogation of Officer Farmer, that this was what we are after and you and your co-counsel, Mr. Lynett are interested in. I can't tell you it didn't happen; I don't think I did it. I don't recall doing it.

Q Well, calling your attention to a question that was posed to Mr. Brooks at that time, November 9, 1971, during the interrogation and the transcript of the recording that was taken at that time, calling your attention to the bottom of page one of that transcript, the question is: "You don't want an attorney present at this time?" And the answer: "I would like to have one, but since there is none, it's all right."

A I don't recall that exchange, but just as I told you this morning on this record, I stipulate the accuracy. The question was posed and that answer posed by your client.

Q Well, with that question and answer taking place at that time, would you consider that a request for an attorney had been made by this defendant?

A Well, if I had to consider just that as theoretical theorem, I would have to say there was some interest made, but, this particular question, I am aware of this question. You have to consider the context of the former question and the question and answer posed afterward and the one posed after that. I did not, as I read that transcript, I did not feel there had been a request for counsel being immediately made available. Now, if you are—the way you posed the question, that question and that answer, would I say? And I have to say that in my mind if that is all I am considering, merely that question and that answer, I have to say there had been an interest had—in the evidence. (Tr. Vol. I, 31–33).

Officer Farmer testified at the suppression hearing:

Q All right. Now, with regard to these statements of Mr. Lynett has made to the Court, did you have occasion at any time during the time that Mr. Brooks was in the interrogation room to call a Judge of any Court?

A I don't recall any—any conversation whatsoever in regard to a Judge.

Q Well, did Mr. Brooks ever make known to you or to someone, other police officer in your presence, that he desired to speak to an attorney or desired to have an attorney appointed to represent him in this matter?

A As my memory serves me right, he agreed to give the statement and during the giving of these rights he did state that he agreed to go ahead with the recording. Then he hesitated and said something about an attorney and then he agreed to go ahead. Then he was again asked if he was willing to—in other words, if he was willing to give this recording without the attorney and he again said, "yes."

Q And, then after that was he asked and did he give you information and did he give you a statement?

A He did. (Tr. Vol. I, 21).

Officer Peasley stated at the trial:

Q Now you recall when you took the recorded statement of Mr. Brooks that you, after giving him the Miranda Rights, you asking if he wished to have an attorney?

A Yes, sir.

Q And do you recall his answer at that time? Referring specifically to the fourth question from the bottom on the first page of your recorded statement of transcript.

A You mean, "Having these rights in mind, do you wish to talk to us without an attorney"?

Q That's the correct question, yes.

A His answer was, "Yes, I'll talk with you."

Q Do you recall asking the next question?

A Yes.

Q And do you recall his answer?

A "You don't want an attorney present at this time"? His answer was, "I would like to have one, but since there is none, it is all right."

Q Did you consider that a request for an attorney?

A No, sir. (Tr. Vol. II, 197).

The trial judge, at the suppression hearing, ruled that the statement made by the petitioner was admissible into evidence. The judge stated:

THE COURT: . . . The only point that I, the Court has, if the Court would stop there, the Court would agree with you in relation to the statement, but the next question that follows is: "Well, we can call one for you,"—follow me—do you follow that on the bottom of page one?

MR. THOMAS LOWERY: Yes.

THE COURT: "Comma—but if you don't want one, we can take the statement. Now, do you want to go ahead and talk to us without an attorney?" Answer: "Yes, I will talk to you," On the following page, question: "You don't want an attorney in the room with you. at this time?" Answer: "No." He has been apprised or at least he was apprised of his constitutional rights at that time as Miranda has stated that he was entitled to an attorney; entitled to the attorney and he didn't have to say another thing, because he knew what the law was and he knew what his rights were. There is no evidence to the effect that he was promised anything for this statement, because from his own statement there wasn't anything said in relation to a promise until after this statement was given and I still don't know that that promise was, if anything, because we never completed that part of the questioning either from you or the State in cross-examination.

Now, he knew and he amply demonstrated the fact that he knew what the law was at the time he made this statement. He has a perfect right and he and he alone has the perfect right of waiving his constitutional position according to the statement that was offered as a joint exhibit by both parties.

The Court can only come to one conclusion and that is, one, he was apprised of his constitutional rights: 2, that he waived those rights. . . . (Tr. Vol. I, 64–65).

This Court disagrees with the trial judge at the suppression hearing and concludes that *Miranda* required the exclusion from evidence of the recorded statement made by petitioner. As indicated by the factual outline above, there is no substantial dispute from the record that the petitioner at the time he made the inculpatory statement was in custody of the Akron Police Department and also that his statement was the product of custodial interrogation. As such, the constitutional requirements of *Miranda* are applicable to this case.

In Miranda v. Arizona, *supra,* the Supreme Court concerned itself with the protection of the Fifth Amendment privilege against compelling an individual to incriminate himself as a result of in-custody interrogation. The Supreme Court concluded that the protection of that privilege required that the police observe certain procedures prior to and during custodial interrogation because of the inherent compulsiveness of police interrogation. The main procedure required by *Miranda* was a comprehensive warning to be given by the authorities prior to interrogation which advised an accused of his right to remain silent and his right to have the presence of counsel. To insure that the advisement

as to the constitutional rights has some meaning, the Supreme Court stated:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. 384 U.S. at 473–474, 86 S.Ct. at 1627–1628 (emphasis added, footnotes omitted).

The United States Court of Appeals for the Sixth Circuit has followed the plain language of *Miranda* set out above in Combs v. Wingo, 465 F.2d 96 (6th Cir. 1972). In *Combs*, the petitioner who was sought on a murder charge surrendered to the authorities. He was informed of his constitutional rights under *Miranda* and then taken to state police station where his constitutional rights were again explained to him. The petitioner indicated he understood his rights and further stated he wanted to make a statement but wanted first to talk to an attorney. The police officers who had the petitioner in custody agreed but then immediately asked the petitioner to read something and proceeded to read to the petitioner a ballistics report on a rifle and a bullet. The police of-

ficer at the petitioner's state court trial testified that the petitioner, after the report was read to him, started to cry and put his head in his hands and then made inculpatory statements regarding the crime. The Court of Appeals found that the statements made by the petitioner Combs after the police officer read the ballistics report was made involuntarily under Fifth Amendment standards as prescribed in *Miranda*. The Court of Appeals found that the portion of *Miranda* opinion set out above was dispositive of the case and conditionally granted the writ of habeas corpus.

Similar results have occurred when an accused, after receiving the requisite *Miranda* warnings, failed to waive the right to remain silent but the authorities nevertheless questioned the accused and obtained incriminating statements. United States v. Ramos, 448 F.2d 398 (5th Cir. 1971). Also, another court held that the same portion of the *Miranda* opinion was a basis for finding a constitutional violation when police continued interrogating an accused after he had requested the aid of counsel and proceeded to procure a written consent to a search that produced incriminating evidence used in the trial. United States v. Fisher, 329 F.Supp. 630 (D. Minn.1971). In *Fisher*, the Court stated

> "The very purpose of the *Miranda* warning are to permit a defendant to refuse further interrogation and to enable him to obtain legal advice as to his rights. The interrogating officers, in any case, when a defendant so expresses himself and lodges such a request, should not continue interrogation nor seek further to procure consensual admissions from him, whether in the form of confessions, consent to search, *waiver of privilege* or otherwise." 329 F.Supp. at 634 (emphasis added).

The Court concludes that the above cited authorities clearly indicate that the actions of the police and county prosecutor in the case at hand violated petitioner's Fifth Amendment right

against self-incrimination as the recorded statement was involuntarily obtained under the standards originally established in *Miranda* and applied in Combs v. Wingo, *supra*. The record clearly shows that the petitioner requested the presence of an attorney, that he was not provided an attorney and that the interrogation continued after petitioner's request. The trial judge at the suppression hearing found that petitioner waived his right to counsel subsequent to his request by agreeing to continue with the questioning after being fully informed of his constitutional rights. The respondent advances that same argument in this action. If their conclusions are accepted, the constitutional protection promised by *Miranda* would indeed be illusory. Merely by continuing to seek a waiver of rights after a request by an accused for the presence of an attorney would be a most effective method of circumventing the guarantees of *Miranda*. The Sixth Circuit Court of Appeals recognized this proposition by its holding in *Combs*.

■ The respondent attempts to distinguish *Combs* from the instant case by contending that the police asked no questions of the petitioner during the interval when the prosecutor sought to obtain a lawyer for the petitioner and thus the police did not "pressure" the petitioner into making the statement. The Court finds, however, that as the Supreme Court stated in *Miranda* the "pressure" exerted during interrogation comes from the vary nature of incommunicado custodial interrogation of individuals in a police-dominated atmosphere. The "pressure" here came from the continued requests of the police and prosecutor that petitioner proceed with the statement without a lawyer. The requests took the form of continued advisement of *Miranda* rights, seeking a waiver of those rights by petitioner. The plain language of *Miranda* and *Combs* prohibits this pressure after an accused has requested the presence of an attorney during interrogation. The two

options of the interrogators available after an accused has expressed his desire to have an attorney are clear. They must either provide counsel for the accused or cease the interrogation. Respondents seek to add a third option: continued efforts to obtain a waiver of the *Miranda* rights. This Court does not find this third option consistent with the express provisions of the *Miranda* and *Combs* decisions. It would result in the substitution of compulsion through the authorities seeking a waiver of rights for the practices of intimidation condemned in *Miranda*. The Court therefore finds that the statement at issue was made involuntarily under Fifth Amendment standards.

■ The respondent contends that even if a constitutional violation occurred, there was no prejudicial error caused by the admission of the statement into evidence at the trial. The Court cannot accept this argument. As indicated in Combs v. Wingo, *supra*, the violation of the Fifth Amendment rights of the accused requires a reversal of the petitioner's conviction. The Court wholeheartedly agrees that where the cherished right against self-incrimination has been violated, it is impossible to determine what prejudicial effect the evidence coming from the accused's own mouth has on the trier of fact. The Court concludes that a reversal of the state court conviction is constitutionally compelled.

The Court, finding a violation of petitioner's constitutional rights occurred in the state court conviction, will issue the writ unless appellant is retried by the State of Ohio and Summit County within a reasonable time without the introduction of any evidence of the unconstitutionally obtained confession or any evidence obtained therefrom. Combs v. Wingo, *supra; see also* Mitchell v. Salisbury, 443 F.2d 324 (6th Cir. 1971).

An order will be entered in accordance with this opinion.